**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

-------------------------------------------------------
                                        :

FREE STATE OF BAVARIA, *represented by* :     CASE NO. 2:22-cv-02580-SDM-CMV
THE UNIVERSITY OF WÜRZBURG,      :
                                          :     Judge Sarah D. Morrison
         Plaintiff,                :
                                          :     Magistrate Judge Chelsey M. Vascura
            v.                  :
                                          :
THE OHIO STATE UNIVERSITY, *et al.,*    :
                                          :
         Defendants.            :
-------------------------------------------------------

<u>**PLAINTIFF THE UNIVERSITY OF WÜRZBURG'S RESPONSE IN OPPOSITION TO DEFENDANT BRIAN KASPAR, M.D.'S MOTION TO DISMISS AMENDED COMPLAINT**</u>

14159999.1

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     LEGAL STANDARD.......................................................................................... 3

        A.      PLEADING STANDARD.................................................................... 3

        B.      STATUTE OF LIMITATIONS ........................................................... 3

III.    UNJUST ENRICHMENT ................................................................................... 4

        A.      THE STATUTE OF LIMITATIONS HAS NOT YET RUN................ 4

The statute of limitations for claims of unjust enrichment is six years pursuant to Ohio Rev. Code § 2305.07. "A claim for unjust enrichment accrues on the date which the money is wrongly retained." *Patel v. Krisjal, L.L.C.*, No. 12AP–16., 2013 WL 1287344, at *7 (Ohio Ct. App. Mar. 28, 2013) (citing *Palm Beach Co. v. Dun & Bradstreet, Inc.*, 665 N.E.2d 718, 723 (Ohio Ct. App. 1995)). This is consistent with "Ohio's general rule that a 'breach of contract action accrues when the breach occurs or when the complaining party suffers actual damages as a result of the breach.'" *G.G. Marck & Assocs., Inc. v. Peng*, 762 F. App'x 303, 308 (6th Cir. 2019) (quoting *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459 (6th Cir. 2013)) (citation omitted). UW's injury did not accrue until a drug product for SMA was approved and began being sold, which was in June 2019, as plead in the Amended Complaint. UW was not actually damaged until Kaspar failed to compensate it for the commercialization of mice containing Dr. Sendtner's SMN knockout allele. Even if UW's damages instead began to accrue in 2018, when Novartis acquired AveXis, UW's unjust enrichment claim against Kaspar would still be timely. Kaspar's brief misapprehends black letter law--the statute of limitations for a claim of unjust enrichment does not accrue at the time the "benefit was received." Kaspar tries to conflate the "benefit" of the mice with Kaspar's unjust enrichment, despite them being different things—the benefit was Kaspar's use of SMN knockout mice and the unjust enrichment (and UW's damages) was Kaspar's profits from the commercialization of Zolgensma. Kaspar also tries to conflate the "benefit" with the "money retained," which, in some cases, are the same thing, but are not here. None of Kaspar's cases are similar to the present facts or stand for the proposition that the claim accrues as of the time the benefit was retained, especially when the benefit and the unjust enrichment were different things and the unjust enrichment did not take place until later. Regardless, the allegations in the Amended Complaint do not "affirmatively show that the claim is time-barred" and therefore the claim cannot be dismissed on this ground. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

        B.      DR. KASPAR IS INDIVIDUALLY LIABLE ...................................... 7

The Amended Complaint pleads that Kaspar intentionally evaded signing UW's MTA each time he received mice containing the SMN knockout allele from OSU, and even lied to Sendtner about using these mice. These "bad acts" are sufficient to infer that Kaspar acted outside of his employment at NCH and/or AveXis. Kaspar is also identified as working on behalf of OSU (and outside of NCH and AveXis) in numerous publications cited in the Amended Complaint. It is clear that Kaspar was the one in control, and he was not merely an "agent-employee" of any employer. Regardless, the Amended Complaint plead facts sufficient to show that the corporate

i

veil may be pierced.

     C.     UNJUST ENRICHMENT WAS SUFFICIENTLY PLEAD ................................. 9

         1.     UW Voluntarily Conferred a Benefit .......................................................... 9

UW's Amended Complaint plead that Kaspar's receipt and use of the mice was permitted by UW–it was his failure to execute UW's MTA that was not. Therefore, UW voluntarily conferred a benefit on Kaspar. The Amended Complaint stated that "Dr. Sendtner, along with Würzburg's administration, wanted to allow other institutions and companies to use the hybrid mouse containing Dr. Sendtner's knockout allele with the hopes that a treatment for SMA could be developed." It made clear that Kaspar, like other researchers, was free to use the mice for academic research, but the commercialization of a drug product using the mouse model without compensating UW under the terms of its MTA was not. Simply because UW required its MTA to be executed before its mice were used does not mean UW did not voluntarily confer the benefit of the mice—there were just conditions to its use. The cases that Kaspar relies on for his argument are not analogous and do not stand for the proposition for which they are cited.

         2.     Kaspar Knew About the Benefit ................................................................ 11

UW has sufficiently plead not only that Kaspar received a benefit, but that Kaspar knew he received a benefit and that this benefit came from UW. The Amended Complaint recited facts demonstrating that Kaspar was aware of the benefit of the SMN knockout mice. These included statements Kaspar made in an interview discussing the development of an SMA gene therapy in which he stated that recent rodent work had "demonstrated significant promise for gene delivery using viruses," that "more studies followed, this time using a SMA-specific mouse model (the now widely used SMNDelta7 mouse" that he obtained "right next-door" from OSU, and that Kaspar's research discovered that the "AAV9 viral vector was able to successfully replace the missing SMN1 gene in the [SMNDelta7] mice." The Amended Complaint also plead that Kaspar knew that this benefit came specifically from UW by at least by 2004 when he spoke with Dr. Sendtner at a conference. In fact, Kaspar's own research on this SMA gene therapy cited back to Burghes' 2005 paper disclosing the Delta7 mouse, which cited to numerous Sendtner publications including the 2002 publication co-authored by Dr. Sendtner and Burghes disclosing the SMN knockout mouse. The Amended Complaint also described the closeness of the relationship between NCH and OSU and between Kaspar and Burghes, indicating that if Burghes knew that UW provided the SMN knockout allele, Kaspar would also have known the provenance of this mouse model that formed the foundation of their joint research.

IV.    TORTIOUS INTERFERENCE ........................................................................................ 16

     A.     THE STATUTE OF LIMITATIONS HAD NOT YET RUN .............................. 16

UW could not plead a claim of tortious interference until UW was damaged, because damages are a necessary element of this claim. UW's injury did not occur until a product developed using UW's mice was commercialized and it was not compensated a portion of these profits, which happened in 2019. Thus, the four-year statute of limitations set forth in Ohio Rev. Code § 2305.09 has not yet run. Those cases relied on by Kaspar concern facts patterns in which the tortious conduct and injury happened at the same time, whereas here, the injury happened at a

later time, so "[t]he four-year limitations period set forth in R.C. 2305.09(D) does not begin to run until the plaintiff has suffered an injury as a result of the alleged tortious conduct of the defendant, even if the plaintiff discovered the tortious conduct before the resulting injury has occurred." *Wisecup v. Gulf Dev.*, 565 N.E.2d 865 (Ohio Ct. App. 1989) Syllabus. However, because the statute of limitations is an affirmative defense, the burden is on Kaspar to show that it has run and he has failed to do so. *See Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001).

B.      KASPAR IS INDIVIDUALLY LIABLE ............................................................ 17

"[I]f an individual engages in conduct satisfying the elements of tortious interference, the individual cannot escape liability merely because she was acting within the scope of her employment." *White v. Adena Health Sys.*, No. 2:17-CV-593, 2018 WL 3377087, at *15–16 (S.D. Ohio July 11, 2018). Kaspar relies on a line of cases that are not applicable here, where the employee alleged to have tortiously interfered with a contract is a third-party to that agreement. *Id.*

C.      TORTIOUS INTERFERENCE WAS SUFFICIENTLY PLEAD ....................... 19

        1.      Legal Standard ......................................................................................... 19

        2.      UW Plead the Existence of a Valid Contract............................................ 19

"A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered, or undertaken by the promisee." *Orwell Nat. Gas Co. v. Fredon Corp.*, 30 N.E.3d 977, 984 (Ohio Ct. App. 2015). Because the SMN knockout mice contained genetic contributions by both UW and OSU, the Agency Agreement allowed each to license and profit from this animal model. As plead in the Amended Complaint, OSU was separately having parties sign its own licensing agreement for these jointly owned mice. Therefore, the benefit to OSU was UW allowing OSU to license OSU's part of the mice, pursuant to the terms of the Agency Agreement. Also made clear in the Amended Complaint is that the detriment to UW was the loss of control over the distribution of the mice and its own MTA.

        3.      UW Plead that NCH Had Knowledge of the Agency
                Agreement ................................................................................................ 20

To satisfy the second prong of the test for tortious interference—knowledge of the contract—plaintiff only need plead "evidence that raises a reasonable inference" that defendant knew that a relationship was governed by an agreement. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). The close working relationship plead in the Amended Complaint, specifically between Burghes (who entered into, and had been performing under, the Agency Agreement and distributing UW's MTA) and Kaspar (who was informed by Dr. Sendtner directly that Kaspar could use his mice only upon signing UW's MTA), creates this reasonable inference. It certainly can reasonably be inferred that Kaspar was aware of the arrangement between OSU and UW for the distribution of the mice and UW's MTA as of 2004 when the first transfer of mice happened. Kaspar undoubtedly would have gained knowledge of the Agency Agreement and UW's MTA requirement after Foust arrived at NCH in 2007, as Foust had already gone through

the process of signing UW's MTA in exchange for mice back in 2002.

4.   UW Plead that Kaspar Intentionally Procured the Breach ........................ 22

UW's Amended Complaint plead that Kaspar lied to Dr. Sendtner about using mice containing his SMN knockout allele, yet nonetheless went on to use these very mice in collaboration with OSU, the other party to the Agency Agreement, to file patent applications, publish articles, and ultimately earn millions of dollars. These facts speak to Kaspar's "conduct," "motive," and the "interests sought to be advanced by the actor" as set forth by *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d, 853, 858 (Ohio 1999). The fact that UW received no compensation despite its contribution to a cure for SMA is relevant to the prong concerning "the interests of others with which the actor's conduct interferes. A balance of "the social interests in protecting the freedom" of NCH with the "contractual interests of others," including UW, would weigh towards preserving the contract between OSU and UW—had UW's MTA been signed, a cure for SMA would still be available, each of the contributing parties would nonetheless have been well compensated, and UW would not have been deprived of compensation for its contribution. Kaspar's interference with the Agency Agreement was also significant and direct. Kaspar researched, published, procured patents, and started a company together with OSU—all in furtherance of a cure for SMA and using mice containing Dr. Sendtner's knockout allele each step of the way. This conduct was proximate and directly harmed UW. Finally, the relations between the parties further supports an inference that Kaspar intentionally procured the breach. Agreements between research institutions are regularly used in the biological sciences to promote access to materials and research, as well as fairness. Allowing Kaspar to breach the Agency Agreement that sought to distribute mice containing Dr. Sendtner's knockout allele would disincentivize universities and companies from entering into such agreements and sharing research. *Total Quality Logistics, LLC v. All. Shippers, Inc.*, 168 N.E.3d 1228, 1254 (Ohio Ct. App. 2021).

V.   CIVIL CONSPIRACY ........................................................................................ 25

      A.   LEGAL STANDARD ............................................................................... 25

      B.   THE AMENDED COMPLAINT PLEADS AN UNDERLYING
           WRONGFUL ACT ................................................................................... 25

           1.   Civil Conspiracy to Commit Tortious Interference Was Plead
                with Sufficient Specificity ........................................................ 25

UW's Amended Complaint alleges that at least two nonparties—NCH, the Research Institute, Kaspar, and Burghes—conspired to induce OSU's breach, causing injury to UW. The Amended Complaint plead that rather than execute UW's MTA before receiving the mice, as required under the Agency Agreement between UW and OSU, Kaspar instead used a back-channel to Burghes' lab to receive mice containing Dr. Sendtner's knockout allele directly from Burghes. UW has plead that this conspiracy was carried out without a reasonable or lawful excuse, but rather to deprive UW of compensation from its contribution to the mice used to develop a cure for SMA. This conspiracy was to UW's detriment and has been plead with specificity. Further, UW satisfied the "malice requirement" which need not be proven expressly or separately from the other elements

14159999.1

of the tort. *Wagoner v. Leach Co.*, No. 17580, 1999 WL 961166, at *19 (Ohio Ct. App. July 2, 1999). Kaspar's lie to Dr. Sendtner about not using mice containing his knockout allele, Kaspar's subsequent admission in an interview that he did receive mice containing this knockout allele from OSU, and Kaspar's ongoing receipt and use of these mice from OSU despite knowing he needed to sign UW's MTA, demonstrates a purposefully wrongful act, which caused injury to UW.

2.     Civil Conspiracy to Commit Fraud and Breach Fiduciary
       Duties Was Plead with Sufficient Specificity ........................................... 28

The Amended Complaint sufficiently plead that, around the time AveXis and Novartis were negotiating, NCH, Kaspar, and OSU maliciously conspired to fraudulently induce UW to enter into the Inter-Institutional Agreement ("IIA") with OSU, as well as that NCH, Kaspar, and OSU maliciously conspired for OSU to breach its fiduciary duties by entering into the IIA with UW without disclosing material facts. The Amended Complaint plead that just three years before OSU induced UW to enter into the IIA, Kaspar became the Chief Scientific Officer at AveXis and NCH and OSU licensed all of their SMA research to AveXis. Kaspar was then issued 2,334,391 shares of AveXis, and therefore knew how much he could gain, while also knowing how much AveXis, NCH, or OSU would have had to compensate UW if UW's MTA had been executed. Then, on April 13, 2016, OSU transferred more SMN knockout mice to AveXis without compensating UW. Only eight months after this 2016 transfer to AveXis (pursuant to a license agreement that Kaspar's brother, Alan, executed on behalf of AveXis), OSU contacted UW about entering into the IIA, claiming OSU just "recently discovered" UW's co-ownership in the mice. AveXis, lead by Kaspar, did not compensate OSU for this AveXis license until nearly two years later, putting it under the purview fraudulently induced-IIA, despite OSU receiving compensation for other licenses within months of execution. The Amended Complaint thus sufficiently plead that Kaspar, OSU, and NCH maliciously conspired for OSU to induce UW to enter into the IIA so that any transfers of mice to Kaspar at NCH and AveXis would be covered by the IIA and not the earlier Agency Agreement that entitled UW to 10% of profits.

VI.    DECLARATORY JUDGMENT ....................................................................... 30

UW's claim for declaratory judgment is not identical to the other causes of action in its Amended Complaint, and could settle the controversy. Further, UW is subject to ongoing harm for every day that passes where it fails to receive any portion of the ongoing royalties from the SMA drug, Zolgensma, which Kaspar and the other Defendants enjoy.

VII.   CONCLUSION .............................................................................................. 30

14159999.1

## TABLE OF AUTHORITIES

CASES                                                                                    PAGES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................. 3

*Atram v. Star Tool & Die Corp*.,
  581 N.E.2D 1110 (Ohio Ct. App. 1989)............................................................ 18

*Avery v. Rossford, Ohio Transp. Improvement Dist*.,
  762 N.E.2d 388 (Ohio Ct. App. 2001)............................................................... 25

*Becker v. Cardinal Health, Inc.*,
  179 N.E.3d 769 (Ohio Ct. App. 2021)............................................................... 21

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................. 3

*Bird v. Delacruz*,
  No. 04-CV-662, 2005 WL 1625303 (S.D. Ohio July 6, 2005)............................ 16

*Campbell v. Grand Trunk W.R.R. Co.*,
  238 F.3d 772 (6th Cir. 2001) ........................................................................ 3, 17

*Carney v. Columbus City Sch. Bd. of Educ.*,
  N0. 2:18-CV-250, 2020 WL 1921206 (S.D. Ohio Apr. 21, 2020) ..................... 26

*Carter v. Am. Aggregates Corp.*,
  611 N.E.2d 512 (Ohio Ct. App. 1992)............................................................... 16

*Cataldo v. U.S. Steel Corp.*,
  676 F.3d 542 (6th Cir. 2012) .......................................................................... 3, 7

*Clark v. Pizza Baker, Inc.*,
  No. 2:18-CV-157, 2020 WL 5760445 (S.D. Ohio Sept. 28, 2020) ..................... 9

*Columbus Green Bldg. Forum v. State*,
  980 N.E.2d 1 (Ohio Ct. App. 2012)..................................................................... 4

*Comer v. Risko*,
  833 N.E.2d 712 (Ohio 2005)........................................................................ 8, 18

*Crown Equip. Corp. v. Toyota Material Handling, U.S.A., Inc.*,
  202 Fed. App'x 108 (6th Cir. 2006) .................................................................. 20

*Deboer Structures (U.S.A.) Inc. v. Shaffer Tent and Awning Co.*,
  233 F. Supp. 2d 934 (S.D. Ohio 2002) .............................................................. 26

14159999.1

*Dombroski v. Wellpoint, Inc.*,
895 N.E.2d 538 (Ohio 2008).................................................................................. 9

*Drozeck v. Laws. Title Ins. Corp.*,
749 N.E.2d 775 (Ohio Ct. App. 2000) ................................................................... 4

*Edwards v. Woodforest Nat. Bank*,
No. 1:11-CV-2205, 2012 WL 1906309 (N.D. Ohio May 24, 2012) ..................................... 21

*Ehplabs Research, LLC v. Smith*,
No. 5:22-CV-0653, 2022 WL 3139604 (N.D. Ohio Aug. 5, 2022)....................................... 19

*Electra v. Dreamers Cabaret, LLC*,
No. 5:18-CV-2706, 2019 WL 3238504 (N.D. Ohio July 18, 2019) ..................................... 10

*Evans v. S. Ohio Med. Ctr.*,
659 N.E.2d 326 (Ohio Ct. App. 1995) ................................................................... 3

*Fred Siegel Co., L.P.A. v. Arter & Hadden*,
707 N.E.2d 853 (Ohio 1999)........................................................................... 22, 23

*G.G. Marck & Assocs., Inc. v. Peng*,
762 Fed. App'x 303 (6th Cir. 2019) ................................................................... 4, 5

*Gibson v. City Yellow Cab Co.*,
No. 20167, 2001 WL 123467 (Ohio Ct. App. 2001) ..................................................... 28

*Golden v. City of Columbus*,
404 F.3d 950 (6th Cir. 2005) ........................................................................... 3

*Grilli v. Smith*,
No. 2012–CA–12, 2012 WL 6712091 (Ohio Ct. App. Dec. 26, 2012) ................................... 6

*Hambleton v. R.G. Barry Corp.*,
465 N.E.2d 1298 (Ohio 1984)........................................................................... 4

*Hoffer v. Cooper Wiring Devices Inc.*,
No. 1:06-CV-763, 2007 WL 1725317 (N.D. Ohio June 13, 2007) ..................................... 16

*Home Warranty, Inc. v. Gonzalez*,
No. 14-CV-010483, 2015 WL 12712361 (Ohio Ct. Com. Pl. Aug. 6, 2015)........................ 10

*Hoover v. Curtis*,
No. 18580, 2001 WL 669369 (Ohio Ct. App. June 15, 2001)............................................. 22

*In re Gregg*,
409 B.R. 464 (Bankr. S.D. Ohio 2009)................................................................. 16

14159999.1

*In re Outsidewall Tire Litig.*,
    No. 1:09-CV-1217, 2010 WL 11474981 (E.D. Va. June 29, 2010) ......................................... 7

*In re Natl. Cent. Fin. Enterprises, Inc.*,
    504 F. Supp. 2d 287 (S.D. Ohio 2007) .................................................................................. 26

*Interroyal Corp. v. Sponseller*,
    889 F.2d 108 (6th Cir. 1989) ....................................................................................... 20, 21

*Koyo Corp. of U.S.A. v. Comerica Bank*,
    No. 1:10 CV 2557, 2012 WL 13024766 (N.D. Ohio Mar. 27, 2012) .................................... 26

*Lambert v. Kazinetz*,
    250 F. Supp. 2d 908 (S.D. Ohio 2003) .............................................................................. 8, 18

*Lamson & Sessions Co.*,
    No. 4:08-CV-1226, 2011 WL 13118867 (N.D. Ohio Feb. 22, 2011) .................................... 17

*Lutz v. Chesapeake Appalachia, L.L.C.*,
    717 F.3d 459 (6th Cir. 2013) ................................................................................................ 4

*Mayer v. Mylod*,
    988 F.2d 635 (6th Cir. 1993) ................................................................................................ 3

*Miami Valley Mobile Health Services, Inc. v. Examone Worldwide, Inc.*,
    852 F.Supp.2d 925 (S.D. Ohio 2012) .................................................................................... 4

*Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.*,
    536 N.E.2d 411 (Ohio Ct. App. 1998) .............................................................................. 4, 16

*Minarik v. Nagy*,
    193 N.E.2d 280 (Ohio Ct. App. 1963) ................................................................................. 25

*MMK Grp., LLC v. Sheshells Co., LLC*,
    591 F. Supp. 2d 944 (N.D. Ohio 2008) ............................................................................... 16

*MP Totalcare Servs., Inc. v. Mattimoe*,
    648 F. Supp. 2d 956 (N.D. Ohio 2009) ............................................................................... 10

*MPW Indus. Servs., Inc. v. Pollution Control Servs., Inc.*,
    No. 2:02-CV-955, 2006 WL 640438 (S.D. Ohio Mar. 9, 2006) ...................................... 10, 11

*Mundinger v. Lamson & Sessions Co.*,
    *No. 4:08-CV-1226, 2011 WL 13118867* (N.D. Ohio Feb. 22, 2011) .................................. 17

*Naiman Fam. Partners, L.P. v. Saylor*,
    161 N.E.3d 83 (Ohio Ct. App. 2020) ................................................................................... 17

14159999.1

*Orwell Nat. Gas Co. v. Fredon Corp.*,
    30 N.E.3d 977 (Ohio Ct. App. 2015) ................................................................................... 19

*Painting Co. v. Ohio State Univ.*,
    No. 09AP-78, 2009 WL 3495053 (Ohio Ct. App. 2009) ......................................................... 5

*Palm Beach Co. v. Dun & Bradstreet, Inc.*,
    665 N.E.2d 718 (Ohio Ct. App. 1995) ................................................................................... 4

*Pappas v. FM2, LLC*,
    99 N.E.3d 1107 (Ohio 2017) ................................................................................................. 8

*Patel v. Krisjal, L.L.C.*,
    No. 12AP-16, 2013 WL 1287344 (Ohio Ct. App. 2013) .................................................. 4, 5

*Red Carpet Studios v. Midwest Trading Grp., Inc.*,
    No. 1:12CV501, 2016 WL 5661681 (S.D. Ohio Sept. 30, 2016) ........................................... 6

*R.E. Schweitzer Constr. Co. v. Univ. of Cincinnati*,
    No. 10AP-954, 2011 WL 3210644 (Ohio Ct. App. July 28, 2011) ........................................ 5

*Reiff v. Mullholland*,
    62 N.E. 124 (Ohio 1901) ....................................................................................................... 8

*Rotsky v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    No. 1:11 CV 2111, 2012 WL 671025 (N.D. Ohio Feb. 29, 2012) ....................................... 19

*RPM, Inc. v. Oatey Co.*,
    No. 3282-M, 2005 WL 663057 (Ohio Ct. App. March 23, 2005) ....................................... 28

*Shatiewi v. Nationwide Ins. Co.*,
    No. C-930756, 1994 WL 660773 (Ohio Ct. App Nov. 23, 1994) ........................................ 17

*Sophia's Cure Inc. v. Avexis, Inc.*,
    No. 2:16-CV-865, 2017 WL 4541449 (S.D. Ohio Oct. 10, 2017) ........................................ 22

*Stuart v. Nat'l Indem. Co.*,
    454 N.E.2d 158 (Ohio Ct. App. 1982) ............................................................................. 8, 18

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ................................................................................................. 3

*Total Quality Logistics, LLC v. All. Shippers, Inc.*,
    168 N.E.3d 1228 (Ohio Ct. App. 2021) ............................................................................... 24

*Universal Coach, Inc. v. New York City Transit Auth., Inc.*,
    629 N.E.2d 28 (Ohio Ct. App. 1993) ................................................................................... 25

*Wagoner v. Leach Co.*,
    No. 17580, 1999 WL 961166 (Ohio Ct. App. July 2, 1999) .......................................... 25, 27

*Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*,
    807 N.E.2d 953 (Ohio Ct. App. 2006) ................................................................................ 22

*White v. Adena Health Sys.*,
    No. 2:17-CV-593, 2018 WL 3377087 (S.D. Ohio July 11, 2018)....................................... 18

*Williams v. Aetna Fin. Co.*,
    700 N.E.2d 859 (Ohio 1998)............................................................................................... 27

*Wisecup v. Gulf Dev.*,
    565 N.E.2d 865 (Ohio Ct. App. 1989)................................................................................. 16

*Wuliger v. Star Bank, N.A.*,
    No. 3:02-CV-1513, 2006 WL 42161 (N.D. Ohio Jan. 6, 2006) ..................................... 25, 30

*Yo-Can, Inc., v. The Yogurt Exch., Inc.*,
    778 N.E.2d 80 (Ohio Ct. App. 2002) .................................................................................. 18

*Younglove Const., LLC v. PSD Dev., LLC*,
    2010 WL 3515603 (N.D. Ohio Sept. 3, 2010)..................................................................... 28

*Zink v. Harp*,
    No. CA90-12-089, 1991 WL 214982 (Ohio Ct. App. 1991)................................................. 5

**Statutes**

Ohio Rev. Code § 2305.07............................................................................................................ 4

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................................ 3

**Other Authorities**

16 Am. Jur. 2d, Conspiracy § 61 (1998)..................................................................................... 25

*Restatement (Second) of Torts* § 767 (1979)........................................................................ 22, 23

I.      **INTRODUCTION**

Defendant, Brian Kaspar, M.D. ("Kaspar"), has moved this Court to dismiss all causes of action against him.  Upon reading Kaspar's brief ("MTD") and support therein, one would think that Kaspar is an "innocent bystander" who is only being included as a party because he made money when Novartis purchased AveXis, and that the University of Wurzburg ("UW") and the Free State of Bavaria are mere profiteers seeking "rich" parties.  That is nonsense.

To set the record straight, Kaspar, Arthur Burghes ("Burghes") of OSU, and Kevin Foust ("Foust") of Nationwide Children's Hospital and the Research Institute (together, "NCH") worked together on a joint project to develop a gene therapy for Spinal Muscular Atrophy ("SMA").  That development **required** a robust animal model for testing purposes.  This animal model was based on the ground-breaking work of Dr. Sendtner at UW, who genetically modified mice to be missing the SMN gene (mice with the "SMN knockout allele" or "SMN knockout mice").  Without that mouse model it would not have been practical, or maybe even possible, to develop such a gene therapy.  The simple fact is that Kaspar knew of UW's rights to that model and, while at NCH and later AveXis, intentionally disregarded those rights.

First, Kaspar worked closely with Burghes (the custodian and distributor of the mouse model containing the SMN knockout allele), on designing a gene therapy for SMA.  As Kaspar revealed in an interview, Burghes provided Kaspar with the SMN knockout mice, and they, along with Kevin Foust, together developed the gene therapy that would become the drug Zolgensma.  Kaspar, Foust, and Burghes are listed as joint inventors on patents directed to the gene therapy, as well as related technology.  The three also published numerous scientific papers together related to SMA.  Clearly the three individuals and their respective institutions, OSU and NCH, operated as close collaborators on a joint project.  The prospect that Kaspar had no knowledge of UW's ownership rights in the mice containing the SMN knockout allele, or that Burghes was

conspicuously "silent" about UW's interests in the mouse model that was crucial to their joint efforts, is for all practical purposes, unbelievable.

Second, Kaspar had been in frequent communications with Foust, starting when Foust was a doctoral student at the University of Florida through when Kaspar hired Foust as a post-doctoral researcher at NCH. Foust not only had direct knowledge of UW's ownership interest in the mice, but Foust was in contact with Dr. Sendtner of UW regarding these mice and facilitated the execution of UW's Material Transfer Agreement ("MTA") while he was at the University of Florida so that he could work with the mice. Then, Foust moved to Kaspar's lab and continued to receive mice from OSU to perform research alongside Kaspar and Burghes. Here again, the Amended Complaint raises a powerful inference that Kaspar, Foust, and Burghes discussed the provenance of the mouse model, UW's rights therein, and the distribution agreement between OSU and UW—each sufficient to put Kaspar on notice of his unauthorized use of the mouse model. Kaspar's contrary inference is not only self-serving, but implausible.

Third, as plead in the Amended Complaint, when first confronted by Dr. Sendtner and asked directectly whether he was using mice with UW's genetic modification, Kaspar intentionally *lied* to Sendtner and said he was not. But he proceeded to receive transfers of these mice up until at least 2016 when he was at AveXis, but never once compensating UW or signing UW's MTA. These bad acts suggest he was either acting outside of his employment or that the corporate veil should be pierced. And Kaspar certainly cannot avoid individual liability for his tortious acts. Given all of the above, Kaspar should hardly question why he is included in this case as an individual. Kaspar's MTD misstates the facts and law in an effort to evade liability. The MTD should be denied.

## II. LEGAL STANDARD

### A. Pleading Standard

To withstand dismissal under Fed. R. Civ. P. 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "is not akin to a probability requirement." *Id.* Nor is the motion to dismiss a challenge to the plaintiff's factual allegations. *Golden v. City of Columbus*, 404 F.3d 950, 958-959 (6th Cir. 2005). On the contrary, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). If more than one inference may be drawn from an allegation, the Court must resolve the conflict in favor of the plaintiff. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). Here, UW's complaint sets forth ample "factual matter" that supports each element of its claims and has discharged its burden of stating a "claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

### B. Statute of Limitations

Generally, "a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is an 'inappropriate vehicle' for dismissing a claim based upon a statute of limitations." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). Dismissal is warranted only if "the allegations in the complaint affirmatively show that the claim is time-barred." *Id.* "Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run." *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001); *see also Evans v. S. Ohio Med. Ctr.*, 659 N.E.2d 326, 329 (Ohio Ct. App. 1995) ("The bar of the statute of limitations is an affirmative defense ... upon which the defendant bears the burden of proof at trial.").

3

## III.    UNJUST ENRICHMENT

### A.    The Statute of Limitations Has Not Yet Run

Claims of unjust enrichment are "quasi-contractual" in nature and have been deemed, for statute of limitations purposes, as "implied contracts not in writing." The limitations period, therefore, is six years pursuant to Ohio Rev. Code § 2305.07.[1] *See* Ohio Rev. Code § 2305.07; *Hambleton v. R.G. Barry Corp.,* 465 N.E.2d 1298, 1301 (Ohio 1984); *Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.*, 852 F.Supp.2d 925, 933 (S.D. Ohio 2012); *Drozeck v. Laws. Title Ins. Corp.*, 749 N.E.2d 775, 780 (Ohio Ct. App. 2000).

"A claim for unjust enrichment accrues on the ***date which the money is wrongly retained***." *Patel v. Krisjal, L.L.C.*, No. 12AP-16, 2013 WL 1287344, at *7 (Ohio Ct. App. 2013) (quoting *Palm Beach Co. v. Dun & Bradstreet, Inc.*, 665 N.E.2d 718 (Ohio Ct. App. 1995) (emphasis added)). This is consistent with "Ohio's general rule that a 'breach of contract action accrues when the breach occurs or when the complaining party suffers actual damages as a result of the breach.'" *G.G. Marck & Assocs., Inc. v. Peng*, 762 Fed. App'x 303, 308 (6th Cir. 2019) (quoting *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 473 (6th Cir. 2013) (citing *Columbus Green Bldg. Forum v. State*, 980 N.E.2d 1, 6 (Ohio Ct. App. 2012)); *see also Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.*, 536 N.E.2d 411 (Ohio Ct. App. 1998) (supplier's breach of contract action against government contractor based on contractor's alleged breach of agreement to submit supplier's cost-saving proposal to government accrued for limitations purposes when government

---

[1] Ohio Rev. Code § 2305.07 was amended on June 15, 2021 to change the statute of limitations period for quasi-contract claims from six years to four years. However, the law is not retroactive and does not apply to claims that accrued prior to June 2021. Therefore, the applicable statute of limitations is six years, and Kaspar does not dispute this. [MTD, ECF No. 59 at PageID 1081-1082.]

instead accepted another similar proposal, rather than when similar proposal was submitted or when government contractor did not perform under the contract, because supplier did not suffer actual damages until alternate proposal was actually accepted by government); *see also Zink v. Harp*, No. CA90-12-089, 1991 WL 214982, at *3 (Ohio Ct. App. 1991) (applying the "delayed damage rule" and finding that while the breach may have actually occurred in 1976, Zink was not able to sue for breach of the contract until his damages occurred in 1990 when he was forced to pay for the removal of the tank that defendant was obligated to remove under the contract); *R.E. Schweitzer Constr. Co. v. Univ. of Cincinnati*, No. 10AP-954, 2011 WL 3210644, at *3 (Ohio Ct. App. July 28, 2011) (quoting *Painting Co. v. Ohio State Univ.*, No. 09AP-78, 2009 WL 3495053, at *4 (Ohio Ct. App. 2009) ("A cause of action for money wrongfully withheld accrues when it is actually withheld.")).

Here, under this blackletter law, UW's injury did not accrue until a drug product for SMA was approved and began being sold in June 2019, at which time Kaspar and the other defendants became unjustly enriched and money was wrongfully retained from UW. [Am. Compl. at ¶¶ 24, 30, 140, ECF No. 48 at PageID 543, 545, 566.] As stated in the Amended Complaint, UW ***wanted*** researchers to enjoy the benefit of mice containing Dr. Sendtner's allele for research purposes, without expecting compensation. [*Id.* at ¶¶ 18-19, 48, PageID 542-543.] However, if and when a therapy was developed and commercialized, UW then required that it be compensated from the profits of such use. [*Id.* at ¶¶ 48, 59, 71, PageID 548, 551-552, 554.] There were no profits from the development of a "commercial" product as a result of using UW's mice ***until*** Zolgensma was first sold in 2019 and money was "wrongfully obtained." *Patel,* 2013 WL 1287344, at *7. Thus, UW was not actually damaged until Kaspar failed to compensate it for the commercialization of mice containing Dr. Sendtner's SMN knockout allele. *G.G. Marck & Assocs., Inc. v. Peng*, 762

Fed. App'x 303, 308 (6th Cir. 2019). Even if UW's damages began to accrue in 2018 when Novartis acquired AveXis, UW's unjust enrichment claim against Kaspar would still be timely.

Kaspar misapprehends the law. The statute of limitations for a claim of unjust enrichment does ***not*** accrue at the time the "benefit" was retained. [MTD, ECF No. 59 at PageID 1081-1082.] In an attempt to make the case law applicable to the present facts, Kaspar conflates the "benefit" of the mice with Kaspar's unjust enrichment, despite them being different things—the benefit was Kaspar's use of SMN knockout mice and the unjust enrichment (and UW's damages) was the value of the use of the mice during the development of Zolgensma. Kaspar also tries to conflate the "benefit" with the "money retained." This is also wrong because the benefit was the use of the mice, and not money. Money was not retained (or even earned) until "profits" from the development of a commercial product made using the mice were realized. None of Kaspar's cases are similar to the facts here, or stand for the proposition that the claim accrues as of the time the ***benefit*** was retained, especially when the benefit and the unjust enrichment were different things, and the unjust enrichment did not take place until later. The court in *Red Carpet Studios v. Midwest Trading Grp., Inc.*, on which Kaspar relies, did not even determine ***when*** the claim accrued, but rather just that claim accrued "before 2009," without explanation as to what event triggered that accrual, apart from that there was "history" between the parties. No. 1:12CV501, 2016 WL 5661681, at *7 (S.D. Ohio Sept. 30, 2016). In *Grilli v. Smith*, another case Kaspar relies on, the money that unjustly enriched the defendant and the benefit conferred on the plaintiff were the same thing and the court simply stated that "a claim for unjust enrichment accrues on the date on which the money is wrongfully obtained." No. 2012–CA–12, 2012 WL 6712091, at *8 (Ohio Ct. App. Dec. 26, 2012). This case is not applicable to the present situation where the "benefit" was different than the "money retained" or unjust enrichment. Here, there was no money period, let

6

alone money to be wrongfully obtained, until Kaspar actually profited.  In fact, Kaspar's own cases confirm the actual law—*In re Outsidewall Tire Litig.* clearly states that "the limitations period ***begins to run at the time of the alleged unjust enrichment***" (***not*** at the time the benefit was conferred).  No. 1:09-CV-1217, 2010 WL 11474981, at *3 (E.D. Va. June 29, 2010).

Kaspar received the benefit of mice containing the SMN knockout allele throughout the period of 2004 to 2016 [Am. Compl. at ¶¶ 87, 105, ECF No. 48 at PageID 558, 560] but Kaspar was not unjustly enriched until 2019.  [*Id.* at ¶¶ 140, 141, 142, PageID 555.]  Simply because SMN knockout mice had value does not mean that Kaspar was unjustly enriched at the time he came into possession of them.  [MTD, ECF No. 59 at PageID 1083.]  If that were the case, then there would not be separate elements of the cause of action of unjust enrichment for the "benefit" and the "unjust enrichment."

Ohio law considers claims of unjust enrichment to be "implied contracts not in writing" for statute of limitations purposes, and Kaspar offers no support for its proposition that the accrual date for a breach of contract and the breach of a "quasi-contract" should be different—neither claim accrues until actual damages have been incurred.  [MTD, ECF No. 59 at PageID 1083.]  UW simply was not damaged, and Kaspar was not unjustly enriched, as of the time he received mice from OSU.  The harm to UW occurred when it was not compensated later for the use of its mice in a commercially successful endeavor.  Regardless, the allegations in the Amended Complaint do not "affirmatively show that the claim is time-barred" and therefore the claim cannot be dismissed on this ground.  *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

**B.     Dr. Kaspar Is Individually Liable**

Kaspar's other bases for requesting dismissal are equally unavailing.  Portraying himself as an "agent-employee" of NCH, the Research Institute, and AveXis, Kaspar purports to be

immune from liability arising from his unjust enrichment. [MTD, ECF No. 59 at PageID 1084.] But the Amended Complaint pleads that Kaspar intentionally evaded signing UW's MTA each time he received mice containing the SMN knockout allele from OSU and even lied to Sendtner about using these mice, which are surely sufficient to infer that Kaspar acted outside of his employment at NCH and/or AveXis as least with respect to these bad acts. [Am. Compl. at ¶¶ 80, 82, 87 ECF No. 48 at PageID 557-58.] Further, Kaspar's unjust enrichment stemmed from tortious acts, for which employees may always be found individually liable. *Lambert v. Kazinetz*, 250 F. Supp. 2d 908, 914–15 (S.D. Ohio 2003); *Comer v. Risko*, 833 N.E.2d 712, 716-717 (Ohio 2005); *Stuart v. Nat'l Indem. Co.*, 454 N.E.2d 158, 163 (Ohio Ct. App. 1982).

Despite it being his burden to prove, Kaspar's motion to dismiss merely concludes that he cannot be personally liable because he was an employee of NCH and AveXis, and argues that the Amended Complaint failed to allege he acted outside the scope of his employment. *Reiff v. Mullholland*, 62 N.E. 124, 124 (Ohio 1901); [MTD, ECF No. 59 at PageID 1084.] The mere fact that Kaspar had an employer is not a sufficient basis to dismiss UW's claims. Interestingly, Exhibits 9 and 21 to the Amended Complaint state that Kaspar was affiliated with OSU, indicating he was working outside of the scope of his employment with both NCH ***and*** AveXis. Kaspar cannot dodge individual liability simple because he was associated with numerous different institutions to the extent each could support his research and the development of a cure for SMA— especially when Kaspar clearly always maintained control of the project.

Regardless, the Amended Complaint plead facts sufficient to show that the corporate veil may be pierced with respect to Kaspar and AveXis. *See Pappas v. FM2, LLC*, 99 N.E.3d 1107, 1120 (Ohio 2017) (awarding restitution for unjust enrichment in employee's personal capacity under the piercing the corporate veil doctrine). In order to pierce the corporate veil and hold an

8

owner liable for the actions of his or her company, a plaintiff must show "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate minds ... (2) control ... was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control." *Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 543 (Ohio 2008). UW has plead that Kaspar had control over AveXis with respect to the research and development of a gene therapy for SMA, which he spearheaded. [Am. Compl. at ¶¶ 76-77 ECF No. 48 at PageID 557-58; *id.* at Ex. 9, ECF No. 48-9 at PageID 653-658.] As an officer and shareholder of AveXis he undoubtedly exercised control over the company. [Am. Compl. at ¶ 100, ECF No. 48 at PageID 560.] Then, as plead throughout the Amended Complaint, Kaspar used this control to use and profit off of the SMN knockout mice, which resulted in UW's injury. Thus, for purposes of the pleading stage, UW's Amended Complaint sufficiently plead that Kaspar acted outside of his employment or that the corporate veil should be pierced.

### C.    Unjust Enrichment was Sufficiently Plead

Kaspar's argument that UW failed to plead unjust enrichment fares no better than his other bases for dismissal. UW has alleged ample facts to support its claim that Kaspar unjustly enriched himself at UW's expense. In order to allege unjust enrichment, a plaintiff must plead: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Clark v. Pizza Baker, Inc.*, No. 2:18-CV-157, 2020 WL 5760445, at *2 (S.D. Ohio Sept. 28, 2020).

### 1.    UW Voluntarily Conferred a Benefit

Kaspar argues that UW failed to allege that UW "voluntarily" conferred a benefit on Kaspar. [MTD, ECF No. 59 at PageID 1085.] Kaspar relies on four cases to support the contention

that the term "voluntary" must be plead as part of the first prong for a claim for unjust enrichment. But these cases use the term "voluntary" only for the purpose of distinguishing between scenarios in which, unlike here, the benefit was literally stolen and not conferred. *See MPW Indus. Servs., Inc. v. Pollution Control Servs., Inc.*, No. 2:02-CV-955, 2006 WL 640438, at *9 (S.D. Ohio Mar. 9, 2006) (stealing client); *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 967 (N.D. Ohio 2009) (stealing trade secrets); *Home Warranty, Inc. v. Gonzalez*, No. 14-CV-010483, 2015 WL 12712361, at *2 (Ohio Ct. Com. Pl. Aug. 06, 2015) (stealing trade secrets); *Electra v. Dreamers Cabaret, LLC*, No. 5:18-CV-2706, 2019 WL 3238504, at *3 (N.D. Ohio July 18, 2019) (stealing names, images, and identities). These cases explicitly "distinguish[ed] between the voluntary bestowing of a benefit with the involuntary taking of it." *MP TotalCare Servs.,* 648 F. Supp. 2d at 967 (citing *MPW Indus. Servs.,* 2006 WL 640438, at *9).

UW's Amended Complaint does not allege UW's grant of the SMN knockout mice was "involuntarily." Rather, it pleads that Kaspar's receipt and use of the mice was permitted –it was his failure to execute UW's MTA that was not. [Am. Compl. at ¶¶ 18, 48, 67, 80, ECF No. 48 at PageID542, 548, 553.] Kaspar, like other researchers, was free to use the mice for academic research. But the commercialization of a drug product using the mouse model without compensating UW under the terms of its MTA was ***not***. Simply because UW required its MTA to be executed before its mice were used does mean UW did not voluntarily confer the benefit of the mice—there were just conditions to its use.

Further, the cases on which Kaspar relies fall short of clarifying the legal standard for stating a claim of unjust enrichment. In fact, apart from only using the term "voluntary" to contrast with a stolen benefit, several use the word "voluntary" in the disjunctive indicating that there is no requirement that the benefit explicitly be plead to be "voluntary." *See MP TotalCare*, 648 F. Supp.

2d at 967 (stating that the benefit can be conferred **_or_** voluntarily); *MPW Indus. Servs.,* 2006 WL 640438, at *9 (finding that this was not a situation where "PCS voluntarily 'bestowed' on MPW the industrial cleaning portion of its business **_or_** 'gave' MPW the [stolen client] account.") (emphasis added).

Nonetheless, the Amended Complaint clearly plead that UW **_did_** voluntarily confer a benefit on Kaspar. [Am. Compl. at ¶ 48, ECF No. 48 at PageID 548 (pleading that "Dr. Sendtner, along with Würzburg's administration, **_wanted to allow other institutions and companies to use the hybrid mouse containing Dr. Sendtner's knockout allele_** with the hopes that a treatment for SMA could be developed.") (emphasis added).] Dr. Sendtner even directly offered these mice to Kaspar. [Am. Compl. at ¶ 82, ECF No. 48 at PageID 557.] The fact that UW entered into a distribution agreement with OSU and agreed to let OSU distribute mice on its behalf, also demonstrates that UW **_wanted_** to confer the benefit of mice containing Dr. Sendtner's knockout allele on others. [*Id.* at ¶¶ 50-57, PageID 549-551.] UW's only condition for the use of its mice was that its MTA be executed—the use of its knockout allele was otherwise freely permissible until the point of commercialization. [*Id.* at ¶ 18, PageID 542.] The fact that Kaspar evaded signing UW's MTA does not mean that the benefit conferred by UW was not voluntary.

### 2. Kaspar Knew About the Benefit

UW has sufficiently plead not only that Kaspar received a benefit, but that Kaspar **_knew_** he received a benefit **_and_** that he knew the benefit came from UW. Contrary to Kaspar's assertion, UW is not required to adduce conclusive proof of Kaspar's knowledge that he had received and used UW's SMN knockout mice at this step in the proceeding—Kaspar may disclaim any knowledge through discovery, but at this stage, the Amended Complaint sets forth facts that create a reasonable inference that Kaspar knew that he wrongfully used and commercialized the mice.

11

The Amended Complaint pleads that Kaspar knew the mice he was using were missing the SMN knockout allele, since the mouse model was described in his 2010 paper and because the gene therapy he discovered worked to reinsert that very missing gene. [Am. Compl. at ¶¶ 89, 141, ECF No. 48 at PageID 558, 566.] The Amended Complaint also plead that Kaspar knew that the SMN knockout allele was owned by UW and discovered by Dr. Sendtner. [Am. Compl. at ¶¶ 82, 84, 89, ECF No. 48 at PageID 557, 558-59, 566.] For Kaspar to now argue that the Amended Complaint is deficient for not sufficiently pleading that he received a benefit from UW is absurd.

While is not entirely clear whether Kaspar's argument is that UW failed to plead that Kaspar knew he received a benefit at all, or that UW did not plead that Kaspar knew specifically that UW was the party who provided him with the benefits, both will be addressed in turn as both were sufficiently plead in the Amended Complaint.

Undoubtedly, Kaspar knew that there was a benefit to be received in the mice containing the SMN knockout allele. The Amended Complaint pleads that many in the academic community and pharmaceutical research circles sought to perform research on the SMN knockout mice. [*Id.* at ¶¶ 49, 52, PageID 549.] The Amended Complaint also pleads that Kaspar sought the benefit of these mice and was aware of the benefit of the mice after receiving them. [*Id.* at ¶ 76, PageID555-556; *id.*at Ex. 9, PageID 653-658.] Kaspar made multiple statements in an interview about the development of an SMA gene therapy, cited in the Amended Complaint, which evidence that he had knowledge of the benefit he received in the SMN knockout mice, including that:

- "Recent work in rodent models of SMA and ALS have demonstrated significant promise for gene delivery using viruses." [*Id.* at Ex. 9, PageID 653-658.]

- "More studies followed, this time using a SMA-specific mouse model (the now widely used SMNDelta7 mouse[2])." [*Id.* at PageID 657]; and

---

[2] The "SMNDelta7 mouse" or the "Delta7 mouse" is the mouse model containing the SMN knockout allele discovered by Dr. Sendtner at UW, the insertion of the SMN2 gene by Dr. Burghes

- An "AAV9 viral vector was able to successfully replace the missing SMN1 gene in the [SMNDelta7] mice." [*Id.*]

Just this exhibit to the Amended Complaint alone clearly showed that Kaspar knew that he received a benefit—a robust mouse model containing a knockout allele—and used this benefit in his successful and lucrative SMA research.[3]

Kaspar also knew that this benefit *came specifically from UW* by at least 2004 when he spoke with Dr. Sendtner at a conference. [Am. Compl. at ¶ 82, ECF No. 48 at PageID 557.] Kaspar argues that UW's Amended Complaint failed to allege that Kaspar "knew he was not entitled to use the mice he received from OSU" and that there is no allegation that "Dr. Sendtner informed Kaspar that mice containing Dr. Sendtner's knockout allele were available for transfer from OSU or that UW had any relationship whatsoever with OSU." [MTD, ECF No. 59 at PageID 1087.] Neither of these comments are relevant, as whether the mice came from OSU or UW has no effect on UW's unjust enrichment claim. The Amended Complaint clearly pleads that Dr. Sendtner informed Kaspar that mice missing the SMN knockout allele were co-owned by UW and subject to UW's MTA. [Am. Compl. at ¶ 82, ECF No. 48 at PageID 557.] Kaspar obtained mice missing the SMN knockout allele from OSU, and collaborated with Burghes using the mice, which was not long after Burghes published an article with Dr. Sendtner disclosing the SMN knockout mouse model and was tasked with distributing UW's MTA for these mice. [*Id*. at ¶¶ 47, 50, 52-

---

at OSU, and a third genetic modification made by OSU. [Am. Compl. at ¶¶ 41-42, 45-47, 75, ECF No. 48 at PageID 547-48, 555.] There is no dispute that UW had an ownership interest in both the Delta7 model as well as its predecessor models.

[3] The Amended Complaint also cites to a book chapter authored by Kaspar and Foust, in which they describe the Delta7 mouse as "frequently used for SMA therapy development." [Am. Compl. at ¶ 218, ECF No. 48 at PageID 578.]

13

54, 76, 87-89, PageID 548-550, 555-556, 558-559; *id*. at Ex. 9, PageID 653-658.]  When Kaspar received the mouse model from OSU, Kaspar received the benefit of Dr. Sendtner's knockout allele, and **_knew_** that this was Dr. Sendtner's knockout allele and that UW had rights to it.  [Am. Compl. at ¶ 82, ECF No. 48 at PageID 557; *id*.at Ex. 9, PageID 653-658.]

The Amended Complaint also illustrates that by 2002, there was interest in using the SMN knockout mice, and that those who requested the mice from OSU were informed of UW's co-ownership.  [*Id*. at ¶¶ 49-57, 71, ECF No. 48 at PageID 549-551, 554.]  Scientists and researchers seeking a cure for SMA were aware of UW's contribution, since, as stated in the Amended Complaint, Dr. Sendtner published the creation of his knockout mouse in 1998.  [*Id*. at ¶ 42, PageID 547; *id*. at Ex. 15, PageID 700.]  It was after reading this article that Burghes contacted Dr. Sendtner about collaborating and contributed the insertion of the SMN2 gene.  [*Id*. at ¶ 43, PageID 547.]  These SMN1/SMN2 mice were then published in 2000 and authored by both Dr. Sendtner and Burghes.  [*Id*.at ¶ 47, PageID 12; *id*. at Ex. 16, PageID 707.]  Then, in 2005, another paper was published by Burghes describing the Delta7 mouse (also containing Dr. Sendtner's knockout allele, along with an additional genetic modification).  [*Id*. at ¶ 84, PageID 557; *id*. at Ex. 17, PageID 716.]  This 2005 paper cited the previous Sendtner and Burghes paper.  In fact, Burghes' 2005 paper cited multiple papers on the SMN gene authored by Dr. Sendtner and his laboratory.  UW's contribution to this area of research was well documented.  Then, in 2010, the research of Burghes, Kaspar, and Foust, using the Delta7 mouse model, was published.  [*Id*. at ¶ 89, PageID558; *id*.at Ex. 18, PageID 730.]  This 2010 paper cited back to the 2005 Burghes paper, which cited the Sendtner publications.[4]  Thus, Kaspar's research built upon the research of

---

[4] Just recently, on October 6, 2022, the academic journal Nature Biotechnology retracted Kaspar's 2010 article because certain "inaccuracies … undermine[d] full confidence in the study." https://www.biospace.com/article/publication-retracts-2010-zolgensma-paper-for-data-

scientists before him, and even his own publications cite back to Dr. Sendtner and UW's contribution. It is therefore not only plausible, but reasonable, to infer that Kaspar knew that Dr. Sendtner at UW provided the benefit of the SMN knockout allele that Kaspar subsequently used in his academic and commercial research.

The Amended Complaint also describes the closeness of the relationship between NCH and OSU and between Kaspar and Burghes, indicating that if Burghes knew that UW provided the SMN knockout allele, Kaspar would also have known the provenance of this mouse model that formed the foundation of their joint research. Burghes and Kaspar together started and ran AveXis, the incubator that ultimately completed the clinical studies required to commercialize the SMA gene therapy. [Am. Compl. at ¶¶ 90-104, ECF No. 48 at PageID 559-560.] Both NCH and OSU licensed their research and intellectual property derived from the studies using the knockout mice to AveXis, and in exchange, NCH and OSU received shares in AveXis and continued royalties. [*Id.* at ¶¶ 95-99, PageID 559-560.] The Amended Complaint also outlines the many collaborations between Kaspar and Burghes, including the fact that they co-authored numerous papers together and were joint inventors on patents directed to treating to the gene therapy for treating SMA. [Am. Compl. at ¶¶ 88-89, 95, ECF No. 48 at PageID 558-559.] Finally, the Amended Complaint also notes that Foust communicated with OSU and Kaspar even before moving to NCH for his post-doctoral fellowship. [*Id.* at ¶ 81, PageID 556-557.] Having personally secured the transfer of mice containing Dr Sendtner's knockout allele from OSU to the University of Florida, Foust undoubtedly knew that any mice containing the SMN knockout allele were co-owned by UW and required an executed UW MTA. Further, it is logical that Foust would have discussed the use of

---

manipulation. This retraction comes two years after FDA performed a similar investigation of Zolgensma for data manipulation by Kaspar and his lab.

the mice and his research on the mice with Kaspar prior to Foust's officially joining Kaspar at NCH in 2007. [Am. Compl. at ¶¶ 55, 70, 80-81, ECF No. 48 at PageID550-551, 554, 556-557.]

The cases that Kaspar relies on for his assertion of "lack of knowledge" concern defendants who did not know they had received a benefit, period—they do not stand for the proposition that an unjust enrichment claim must be dismissed because the specific knowledge of *who* provided the benefit was not known. *See MMK Grp., LLC v. SheShells Co., LLC*, 591 F. Supp. 2d 944, 965 (N.D. Ohio 2008); *Hoffer v. Cooper Wiring Devices Inc.*, No. 1:06-CV-763, 2007 WL 1725317, at *5 (N.D. Ohio June 13, 2007); *Bird v. Delacruz*, No. 04-CV-662, 2005 WL 1625303, at *6 (S.D. Ohio July 6, 2005). Or, in the case of *In re Gregg*, there was no benefit conferred *at all* to the debtor/defendant. 409 B.R. 464, 467 (Bankr. S.D. Ohio 2009). In any event, Kaspar cannot disclaim knowledge of the source of the benefit given the various facts that plausibly and reasonably raise inferences to the contrary.

## IV. TORTIOUS INTERFERENCE

### A. The Statute of Limitations Had Not Yet Run

"In general, the limitation period commences when the plaintiff has suffered an injury as a result of the alleged tortious conduct." *Carter v. Am. Aggregates Corp.*, 611 N.E.2d 512, 516 (Ohio Ct. App. 1992) (citing *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.*, 536 N.E.2d 411 (Ohio Ct. App. 1988) and *Wisecup v. Gulf Dev.*, 565 N.E.2d 865 (Ohio Ct. App. 1989)).

UW could not plead a claim of tortious interference until UW was damaged, because damages are a necessary element of this claim. UW's injury did not occur until a product developed using UW's mice was commercialized and it was not compensated a portion of these profits, which happened in 2019. [Am. Compl. at ¶ 139, ECF No. 48 at PageID 566.] By its plain terms, UW's MTA allowed use of mice containing Dr. Sendtner's knockout allele for academic

research and when "any profit is made by the commercial use of the inventions (either patented or not) made through the use of the material" UW be entitled to a portion of the profit. [Am. Compl. at ¶¶ 18, 59, PageID542, 551.] Most cases, including those relied upon by Kaspar, concern fact patterns in which the tortious conduct and injury happened at the same time. But here, the injury happened later, so the "cause of action in tort does not accrue until the Plaintiff suffers injury." *Mundinger v. Lamson & Sessions Co.*, No. 4:08-CV-1226, 2011 WL 13118867, at *8 (N.D. Ohio Feb. 22, 2011).

Kaspar's MTD cites no law for the proposition that when the events giving rise to the claim take place at a different time than the injury, the statute must start to run at the time of the former and not the latter. In the case that it tries to rely on for this proposition, *Naiman Fam. Partners, L.P. v. Saylor*, initial damages occurred followed by subsequent injuries. 161 N.E.3d 83, 89 (Ohio Ct. App. 2020). The court found that the statute of limitations was not tolled from these continued unlawful acts. But that case is not analogous to the facts here.

Indeed, because the statute of limitations is an affirmative defense, the burden is on Kaspar to show that it has run. *See Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). Kaspar has not met that burden and the Amended Complaint does not establish on its face that UW's claim of tortious interference is barred by the statute of limitations.

### B.    Kaspar is Individually Liable

Kaspar's argument that UW's tortious interference claim must be dismissed because Kaspar is an employee of NCH and AveXis fails as a matter of law. "[W]ith any tort, the negligent party, even if acting within the scope of employment … may be personally liable." *Shatiewi v. Nationwide Ins. Co.*, No. C-930756, 1994 WL 660773, at *1 (Ohio Ct. App. Nov. 23, 1994). "It is true that Ohio law precludes individual liability [for tortious interference] ***when the individual***

17

*is an employee of a party to the relationship at issue*, unless the employee acted solely in his or her individual capacity and benefitted from the alleged interference." *White v. Adena Health Sys.*, No. 2:17-CV-593, 2018 WL 3377087, at *15 (S.D. Ohio July 11, 2018) (emphasis added). This rule though—and the line of cases Kaspar relies on—**does not extend to situations where, like here, the employee alleged to have tortiously interfered with a contract *is a third-party to that agreement***. *White v. Adena Health Sys.*, No. 2:17-CV-593, 2018 WL 3377087, at *15–16 (S.D. Ohio July 11, 2018). Therefore, "if an individual engages in conduct satisfying the elements of tortious interference, the individual cannot escape liability merely because she was acting within the scope of her employment." *Id.*; *see also Comer v. Risko*, 833 N.E.2d 712, 716-717 (Ohio 2005) ("An agent who committed the tort is primarily liable for its actions, while the principal is merely secondarily liable."); *Stuart v. Nat'l Indem. Co.*, 454 N.E.2d 158, 163 (Ohio Ct. App. 1982) ("[B]oth the agent and the disclosed principal are liable for tortious misconduct by the agent within the scope of his employment."). This is true as well for corporate officers (like Kaspar was at AveXis), who "may be held liable for the torts they commit while acting within the scope of their employment." *Lambert v. Kazinetz*, 250 F. Supp. 2d 908, 914–15 (S.D. Ohio 2003). "[I]f an agent commits a tort in the course of his agency, 'the fact of agency will not relieve him of liability, and this is so even though the principal may be liable also.'" *Id.* (citing *Atram v. Star Tool & Die Corp.*, 581 N.E.2d 1110, 1113 (Ohio Ct. App. 1989)). Further, "the fact that the Plaintiffs may not be able to pierce the corporate veil is irrelevant to the issue of [defendant corporate agent's] personal liability for his own conduct." *Lambert v. Kazinetz*, 250 F. Supp. 2d 908, 914–15 (S.D. Ohio 2003), (citing *Yo–Can, Inc., v. The Yogurt Exch., Inc.*, 778 N.E.2d 80, 91 (Ohio Ct. App. 2002) (citation omitted). UW also incorporates by reference the remaining arguments stated in Section III(B) above.

### C.     Tortious Interference was Sufficiently Plead

#### 1.     Legal Standard

A claim for tortious interference with a contractual relationship requires proof of the following elements: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *EHPLabs Research, LLC v. Smith*, No. 5:22-CV-0653, 2022 WL 3139604, at \*5 (N.D. Ohio Aug. 5, 2022).

#### 2.     UW Plead the Existence of a Valid Contract

Kaspar is wrong that there was "no benefit received by OSU" and "no detriment was sustained" by UW.  "A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered, or undertaken by the promisee." *Orwell Nat. Gas Co. v. Fredon Corp.*, 30 N.E.3d 977, 984 (Ohio Ct. App. 2015).  It is established that the mice were in demand, and that OSU was entertaining inquiries from others about how to acquire the mice.   [Am. Compl. at ¶¶ 49-50, 52 ECF No. 48 at PageID 549.]  The Agency Agreement streamlined the process and enabled UW to perfect its rights and OSU to facilitate licenses (furthering its own objectives to do so).  Therefore, the benefit to OSU was UW allowing OSU to license OSU's part of the mice, pursuant to the terms of the Agency Agreement.  [Am. Compl. at ¶¶ 53, 58, 79, ECF No. 48 at PageID 550-551, 556.] Also made clear in the Amended Complaint is that the detriment to UW was the loss of control over the distribution of the mice and its own MTA.  [Am. Compl. at ¶¶ 54-57 ECF No. 48 at PageID 550-51.]  The Agency Agreement was more than a "gratuitous promise."   The facts here are unlike those in *Rotsky v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, where the court found

that "Plaintiff does not promise to do, or not to do, anything. No benefit adheres to defendant."
No. 1:11 CV 2111, 2012 WL 671025, at *6 (N.D. Ohio Feb. 29, 2012).

### 3.    UW Plead that NCH Had Knowledge of the Agency Agreement

UW sufficiently plead that Kaspar knew of the agreement between OSU and UW for OSU
to distribute mice containing Dr. Sendtner's knockout allele.  To satisfy the second prong of the
test for tortious interference, plaintiff only need plead "evidence that raises a reasonable inference"
that defendant knew that a relationship was governed by an agreement. *Crown Equip. Corp. v.
Toyota Material Handling, U.S.A., Inc.*, 202 Fed. App'x 108, 114 (6th Cir. 2006) (citing *InterRoyal
Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)) ("Rather, Crown need only provide
sufficient evidence to support a 'reasonable inference' that TMHU knew the nature of the
relationship—i.e., that Crown's contract was exclusive.").

The close working relationship specifically between Burghes (who entered into, and had
been performing under, the Agency Agreement by distributing UW's MTA) and Kaspar (who was
informed by Dr. Sendtner directly that Kaspar could use his mice only upon signing UW's MTA)
creates this reasonable inference.  [Am. Compl. at ¶¶ 76, 90-104, ECF No. 48 at PageID555-556,
559-560.]  It certainly can reasonably be inferred that Kaspar was aware of the arrangement
between OSU and UW for the distribution of mice and UW's MTA as of 2004 when the first
transfer of mice happened.  Kaspar also would have known that OSU and UW co-owned the SMN-
/SMN2 mice, as that mouse model was published by Burghes and Sendtner in 2002, which was
then cited in the 2005 publication of the Delta7 mice—the mouse model used in Kaspar's own
work.  Kaspar' own 2010 paper cites directly to the 2005 publication disclosing the Delta7 mice.
[Am. Compl. at ¶ 89, ECF No. 48 at PageID 558-559.]

Further, Kaspar's brief ignores the fact that the breach of the Agency Agreement that took

place in 2004 was not the only breach alleged in the Amended Complaint.  Because the Delta7 mice live only fourteen days, numerous transfers would have been made, until at least just prior to 2010 when Foust and Kaspar published their findings, but likely beyond.  [Am. Compl. at ¶ 87, PageID 558.]  It plead that mice containing Dr. Sendtner's knockout allele were still being used by researchers as late as 2016, when OSU transferred more of these mice to AveXis.  [Am. Compl. at ¶ 105, PageID 560; *id.* at Ex. 19, PageID 742.]  Therefore, even if Kaspar is found not to have had knowledge of the Agency Agreement in 2004, he certainly would have gained knowledge of it, and UW's MTA requirement, **after** Foust arrived at NCH, as Foust was familiar with the Agency Agreement, having already gone through the process of signing UW's MTA in exchange for mice back in 2002.  [Am. Compl. at ¶¶ 55, 70, 80-81, ECF No. 48 at PageID 550, 554, 556-557.]  This cause of action was sufficiently plead by providing "evidence that raises a reasonable inference" that Kaspar knew UW and OSU had an agreement with respect to the distribution of mice containing Dr. Sendtner's knockout allele.  *See InterRoyal*, 889 F.2d at 111.

Unlike the cases relied on by Kaspar, UW did not set forth "purely conclusory" allegations concerning Kaspar's knowledge, nor did it fail to allege such knowledge.  [MTD, ECF No. 59 at PageID 1093.]  In those cases, the subject complaints did not plead *any* factual allegations concerning such knowledge.  *See Edwards v. Woodforest Nat. Bank*, No. 1:11-CV-2205, 2012 WL 1906309, at *5 (N.D. Ohio May 24, 2012) ("Plaintiffs' general assertions in their opposition briefs that 'business opportunities were lost with building multiple MLK Entertainment Complexes' are purely conclusory and insufficient to plead required elements of a tortious interference claim"); *Becker v. Cardinal Health, Inc.*, 179 N.E.3d 769, 779 (Ohio Ct. App. 2021) ("Though appellants allege generally in the complaint that Cardinal Health was aware that it's actions would result in increased costs to holders of health insurance, they make **no allegation** that Cardinal Health had

any knowledge of the specific contracts between appellants and their insurers.") (emphasis added); *Sophia's Cure Inc. v. AveXis, Inc.*, No. 2:16-CV-865, 2017 WL 4541449, at *7 (S.D. Ohio Oct. 10, 2017) ("Plaintiff does not allege, however, that AveXis's former CEO, Carbona, possessed personal knowledge of the Donation Agreement or its terms at the time of those alleged breaches.") Here, UW alleged such knowledge by Kaspar and provided numerous facts in support of this conclusion.

### 4. UW Plead that Kaspar Intentionally Procured the Breach

As UW alleges in detail in its Amended Complaint, the breach of the Agency Agreement was intentionally procured by Kaspar. [*See* Am. Compl. at ¶¶ 222-230, ECF No. 48 at PageID 578-579.] To satisfy the "intentional procurement" prong, "consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 855 (Ohio 1999) (citing, *Restatement (Second) of Torts* § 767 (1979)). Whether defendant intentionally caused the procurement of the breach may be established by circumstantial evidence. *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*, 807 N.E.2d 953, 964 (Ohio Ct. App. 2006) (citing *Hoover v. Curtis*, No. 18580, 2001 WL 669369, at *6 (Ohio Ct. App. June 15, 2001)).

The Amended Complaint plead that Kaspar lied to Dr. Sendtner about using mice containing the SMN knockout allele, yet nonetheless went on to use these very mice in collaboration with OSU, the other party to the Agency Agreement, to file patent applications, publish articles, and ultimately earn millions of dollars. [Am. Compl. at ¶¶ 82, 87-89, 95, 150,

ECF No. 48 at PageID 557-559, 567.] These facts speak to prongs 1-3 of the Restatement test: Kaspar's "conduct," "motive," and the "interests sought to be advanced by the actor." *Fred Siegel Co.,* 707 N.E.2d at 855. Had Kaspar not intended to deprive UW of the benefit of its agreement with OSU to distribute UW's MTA, then Kaspar would have had no reason to lie to Dr. Sendtner. Moreover, even if Kaspar did not intentionally procure the breach of the Agency Agreement when he lied to Dr. Sendtner, he surely would have subsequently broached the issue with Burghes, and then have the requisite intent, as "silence" on the existence of the Agency Agreement by Burghes is not believable. As alleged in the Amended Complaint, Burghes and Kaspar were working closely together. [Am. Compl. at ¶¶ 87-89, ECF No.48 at PageID 558-559.]

The fact that UW received no compensation despite its contribution to a cure for SMA is relevant to the prong concerning "the interests of others with which the actor's conduct interferes." *Fred Siegel Co.,* 707 N.E.2d at 857-858 (citing *Restatement (Second) of Torts* § 767 (1979)). A balance of the "the social interests in protecting the freedom" of NCH with the "contractual interests of others," including UW, would weigh towards preserving the contract between OSU and UW. *Id.* Had UW's MTA been signed, a cure for SMA would still be available, each of the contributing parties would nonetheless have been well compensated, and UW would not have been deprived of compensation for its contribution.

With respect to the second to last prong, Kaspar's "interference, as demonstrated by the proximity or remoteness of the … conduct to the interference" was significant and direct. *Id.* at 179. Kaspar researched, published, procured patents, and started a company together with OSU (AveXis)—all in furtherance of a cure for SMA and using mice containing Dr. Sendtner's knockout allele each step of the way. [Am. Compl. at ¶¶ 88-90, 95, 150, ECF No. 48 at PageID 558-559, 567.] This conduct was proximate and directly harmed UW. Without the use of UW's

mice missing the SMN gene, NCH would never have been able to develop and commercialize a gene therapy that works by inserting back the missing gene. [*Id.* at ¶ 141, PageID 566.] NCH's use [that Kaspar lied about to Dr. Sendtner] directly caused UW's injury, as UW was only allowing researchers to use its mice if they executed UW's MTA and agreed to pay UW 10% of profits from any commercialization. The harm here is not only traceable, but direct. This further supports a finding that Kaspar's interference was intentional.

Finally, the close relationship of the parties further supports an inference that Kaspar intentionally procured the breach. Kaspar from NCH and Dr. Sendtner from UW were both scientific researchers at academic and research institutions and both researching SMA. Agreements between institutions are regularly used in the biological sciences to promote access to materials and research, as well as fairness. [Am. Compl. at ¶ 17, ECF No. 48 at PageID 542.] Allowing Kaspar to breach the Agency Agreement that sought to distribute mice containing Dr. Sendtner's knockout allele would disincentivize universities and companies from entering into such agreements. *Total Quality Logistics, LLC v. All. Shippers, Inc.*, 168 N.E.3d 1228, 1254 (Ohio Ct. App. 2021) (applying last prong of test for intentional procurement and holding that "deeming such interference proper in light of the competition between the parties would allow companies like Alliance to escape liability despite disregarding [ ] agreements."). It is simply untrue that UW "fails to allege a single fact concerning Dr Kaspar's facilitation of OSU's breach." [MTD, ECF No. 59 at PageID 1094-1095.] Here, it was Kaspar's procurement of the mice itself that was also OSU's breach of the Agency Agreement. Indeed, because Kaspar knew these were UW's mice and that OSU was distributing them only with UW's MTA, his very receipt of the mice without signing an MTA shows that he intended to cause the breach or was substantially certain he would cause a breach.

24

V.      **CIVIL CONSPIRACY**

A.      **Legal Standard**

"In Ohio, a civil conspiracy consists of the following: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.,* 629 N.E.2d 28, 33 (Ohio Ct. App. 1993) (quoting *Minarik v. Nagy*, 193 N.E.2d 280 (Ohio Ct. App. 1963)). A plaintiff is "not required to plead with particularity each and every element of the claim of civil conspiracy." *Universal Coach*, 629 N.E.2d at 33. Civil conspiracy must be plead with "some specificity." *Wuliger v. Star Bank, N.A.*, No. 3:02-CV-1513, 2006 WL 42161 at *6 (N.D. Ohio Jan. 6, 2006); *Avery v. Rossford, Ohio Transp. Improvement Dist.*, 762 N.E.2d 388, 395 (Ohio Ct. App. 2001).

B.      **The Amended Complaint Pleads an Underlying Wrongful Act**

UW's Amended Complaint sufficiently pleads that NCH, Kaspar, and Burghes conspired to tortiously interfere with the contract between UW and OSU, and that NCH, Kaspar, OSU, and Burghes conspired to commit fraud by inducing UW to enter into the Inter-Institutional Agreement ("IIA") with OSU, in an attempt to circumvent the Agency Agreement, and conspired for OSU to commit the tort of breach of fiduciary duty. The Amended Complaint raises a reasonable inference that this conspiracy occurred, and why, how, and when it occurred.

1.      **Civil Conspiracy to Commit Tortious Interference Was Plead with Sufficient Specificity**

"A cause of action may exist for conspiracy to tortiously interfere with a contractual relationship. The claim, however, must involve two or more nonparties conspiring to induce a party to breach his contract." *Wagoner v. Leach Co.*, No. 17580, 1999 WL 961166, at *19 (Ohio Ct. App. July 2, 1999) (citing 16 Am. Jur. 2d, Conspiracy § 61 (1998)).

25

UW's Amended Complaint alleges that at least two nonparties—NCH, the Research

Institute, Kaspar, and Burghes—conspired to induce OSU's breach, causing injury to UW. [Am.

Compl. at ¶¶ 232-236, ECF No. 48 at PageID 580-581.] The Amended Complaint pleads that

rather than execute UW's MTA before receiving the mice, as required under the Agency

Agreement between UW and OSU, Kaspar instead used a back-channel to Burghes' lab to

receive mice containing Dr. Sendtner's knockout allele directly from Burghes. [Am. Compl. at

¶¶ 76-83, ECF No. 48 at PageID 555-557; *id*. at Ex. 9, = PageID 653-657 (Kaspar referring to his

"connections next-door, literally").] UW has plead that this conspiracy was carried out without a

reasonable or lawful excuse, but rather to deprive UW of compensation from its contribution to

the mice used to develop a cure for SMA. [Am. Compl. at ¶¶ 232-236, ECF No. 48 at PageID

580-581.] This conspiracy was to UW's detriment and has been plead with specificity, even

though "there is no requirement that a common law conspiracy claim must be pled with

particularity." *Carney v. Columbus City Sch. Bd. of Educ.*, No. 2:18-CV-250, 2020 WL

1921206, at *7 (S.D. Ohio Apr. 21, 2020) (Morrison, J.) (citing *In re Natl. Cent. Fin.

Enterprises, Inc.*, 504 F. Supp. 2d 287, 329 (S.D. Ohio 2007); [Am. Compl. at ¶¶ 235-236, ECF

No. 48 at PageID 580-581.] The cases relied on by Kaspar, unlike here, considered instances

where there were absolutely no allegations of a conspiracy. *See Carney*, 2020 WL 1921206, at

*7 (citing *DeBoer Structures (U.S.A.) Inc. v. Shaffer Tent and Awning Co.*, 233 F. Supp. 2d 934,

945 (S.D. Ohio 2002) (finding "no allegations—even generally—that support the existence of a

'common understanding'"); *Koyo Corp. of U.S.A. v. Comerica Bank*, No. 1:10 CV 2557, 2012

WL 13024766, at *6 (N.D. Ohio Mar. 27, 2012) (finding "no factual allegations"). Here, there

are direct allegations that Burghes and Kaspar conspired to transfer Kaspar mice at NCH,

circumventing OSU's contractual obligations to UW. [Am. Compl. at ¶¶ 76-83, ECF No. 48 at PageID 555-557; *id*. at Ex. 9, PageID 653-657.]

Further, the pleading requirement with respect to "malice" has been met. The malice required by the first element of civil conspiracy is only "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998) (citations omitted). Malice need not be proven expressly or separately from the other elements of the tort. *Wagoner,* 1999 WL 961166, at *19. Kaspar's lie to Dr. Sendtner about not using mice containing his knockout allele, Kaspar's subsequent admission in an interview that he received mice containing this knockout allele from OSU, and Kaspar's subsequent receipt and use of these mice from OSU through 2016, despite knowing he needed to sign UW's MTA, demonstrates a purposefully wrongful act that caused injury to UW. [Am. Compl. at ¶¶ 76-78, 80, 82, 157-58, 232-235, ECF No. 48 at PageID 555-557, 569, 580; *id*. at Ex. 9, PageID 653-657.]

The Amended Complaint sets forth that, as an experienced researcher, Kaspar undoubtedly knew that the use of an animal model, created and owned by other institutions, would not come free of cost or obligations. [Am. Compl. at ¶ 83, ECF No. 48 at PageID 557.] But rather than simply execute UW's MTA before obtaining mice, Kaspar conspired with Burghes to nonetheless receive the mice despite OSU's Agency Agreement with UW. NCH, Kaspar, and Burghes knew they stood to gain if a successful gene therapy for SMA was developed, especially in light of their shares and other financial interest in AveXis. [*Id*. at ¶¶ 29, 97, 235 PageID 543, 559, 580.] They also knew that UW's MTA contained the 10% of profits clause, but avoided signing it. [*Id.* at ¶¶ 80, 82, 224, PageID 556-557, 578.] These facts create a plausible inference that Kaspar acted with malice when he conspired with the others for OSU to breach the Agency Agreement.

27

2.      **Civil Conspiracy to Commit Fraud and Breach Fiduciary Duties Was Plead with Sufficient Specificity**

Parties can conspire to commit both fraud and a breach of fiduciary duty. *See Gibson v. City Yellow Cab Co.*, No. 20167, 2001 WL 123467, at *4 (Ohio Ct. App. 2001).  The Amended Complaint sufficiently pleads that OSU owed a fiduciary duty to UW.  [Am. Compl. at ¶¶ 68-70, 178-180, ECF No. 48 at PageID 553-554, 572.][5]  Around the time AveXis and Novartis were negotiating, NCH, Kaspar, and OSU maliciously conspired to fraudulently induce UW to enter into the IIA with OSU.  [Am. Compl. at ¶¶ 237-239, 244, ECF No. 48 at PageID 581-582.]  NCH, Kaspar, and OSU also maliciously conspired for OSU to breach its fiduciary duties by failing to disclose material facts to UW during the negotiations leading up to the IIA.  [*Id*. at ¶¶ 240-244, PageID 582.]

UW has plead these claims with specificity.  The Amended Complaint detailed that just three years before OSU induced UW to enter in to the IIA, Kaspar became the Chief Scientific Officer at AveXis [*id.* at ¶ 100, PageID 560] and NCH and OSU licensed all of their SMA research to AveXis.  [*Id*. at ¶¶ 96-98, PageID 559-560.]  Kaspar was then issued 2,334,391 shares of

---

[5] Kaspar argues that a UW has not established a fiduciary relationship and that its conspiracy to breach fiduciary duties claim must fail. [MTD, ECF No. 59 at PageID 1098, n.2.]  Unlike the case on which it relies however, where the court found that the mere disclosure of financial information did not create a fiduciary duty and that plaintiff did not even "suggest that the parties mutually agreed" to create such a relationship, the Amended Complaint does. *RPM, Inc. v. Oatey Co.,* No. 3282-M, 2005 WL 663057, at *5 (Ohio Ct. App. March 23, 2005) (deciding the issue on a directed verdict, not a motion to dismiss).  Not only does the Amended Complaint cite to written communications demonstrating that a "special trust of confidence has been reposed," but this special relationship was also recognized by others, including Kaspar's colleague, Kevin Foust. [Am. Compl. at ¶¶ 69-70, ECF No. 48 at PageID 554.]  Unlike the cases Kaspar cites, OSU and UW were not merely in a "commercial business relationship[s]" where they "dealt with each other at arm's length, each acting to protect its own interests." *Younglove Const., LLC v. PSD Dev., LLC*, No. 3:08CV1447, 2010 WL 3515603, at *4 (N.D. Ohio Sept. 3, 2010).  This is because UW and OSU were co-owners of the SMN knockout mouse and therefore had a joint ownership interest as well as a joint interest in seeing these mice distributed and used.

AveXis, and therefore knew how much he could gain upon AveXis' acquisition and the future sales of the gene therapy.  Kaspar also knew how much AveXis, NCH, or OSU would have had to compensate UW if UW's MTA had been executed.  [*Id.* at ¶ 101, PageID 560.]  Then, on April 13, 2016, OSU transferred more SMN knockout mice to AveXis, without compensating UW.  [*Id.* at ¶¶ 157-58; *Id.* at Ex. 19 PageID 569, 742-749.]  Only eight months after this 2016 transfer to AveXis (pursuant to a license agreement that Kaspar's brother, Alan, executed on behalf of AveXis), OSU contacted UW about entering into the IIA, claiming they just "recently discovered" UW's co-ownership in the mice.  [Am. Compl. at ¶ 109, ECF No. 48 at PageID 561.]  AveXis, lead by Kaspar, did not compensate OSU for this license until nearly two years later, putting it under the purview IIA, despite OSU receiving compensation for other licenses within months of execution.  [*Id.* at ¶ 160, PageID 569.]  The Amended Complaint thus sufficiently plead that Kaspar, OSU, and NCH maliciously conspired for OSU to induce UW to enter into the IIA so that any transfers of mice to Kaspar at NCH and AveXis would be covered by the IIA and not the earlier Agency Agreement.  In inducing UW to enter into the IIA, the co-conspirators failed to disclose material facts to UW during the negotiations, including the imminent Novartis acquisition and FDA approval of Zolgensma.  [Am. Compl. at ¶¶ 107-114, 117-129, 237-244, ECF No. 48 at PageID 560-562, 563-565, 581-582.]

NCH, Kaspar, and OSU's object for inducing UW to enter into the IIA was to ensure that they would not need to share the profits from the commercialization of their SMA gene therapy with UW.  [*Id.* at ¶¶ 137-139, 141-144, 169, 237-239, 241-228, PageID566-567, 570, 581-582 .]  NCH, Kaspar, and OSU accomplished this, as UW was never compensated under the terms of its MTA, or otherwise, causing injury to UW.  [*Id.* at ¶¶ 145, 149, 176, PageID 567, 572.]  Malice was demonstrated through OSU's misrepresentations and omissions and through Kaspar's lie to

Dr. Sendtner, as well as AveXis delaying payment for the mice. By misleading UW, Kaspar and the other defendants induced UW to enter into the back-dated IIA, and caused UW to believe it was owed only approximately $25,000 for past use of its mice. [*Id*. at ¶¶ 28, 115, PageID 544, 563.] Further, because UW's underlying claims of fraud and breach of fiduciary include allegations of bad faith, this also contributes to a finding of malice under civil conspiracy. *Wuliger*, 2006 WL 42161, at *7; [*see also*, Am. Compl. at ¶¶ 177-203, ECF No. 48 at PageID572-575.] These facts create a plausible inference that NCH acted with malice.

## VI.    DECLARATORY JUDGMENT

UW's claim for Declaratory Judgment should stand. UW's Amended Complaint prays for a declaration that NCH must reimburse Würzburg for its contributions to a cure for SMA, "including but not limited to a declaration that Würzburg is due royalties from all sales of Zolgensma." [Am. Compl. at ¶ 248, ECF No. 48 at PageID 583.] The Amended Complaint clearly states UW's ground for relief by asking for royalties, as opposed to "10% of $1 billion ($100 million) for each year that Zolgensma is sold" as stated elsewhere in the Amended Complaint. [*See id*. at ¶ 148, PageID 567.] The request for relief is not identical, but nonetheless could settle the controversy. Further, UW is subject to ongoing harm for every day that passes where it fails to receive any portion of the ongoing royalties from Zolgensma, which Kaspar and the other Defendants enjoy. [*Id*. at ¶¶ 99, 143, PageID 560, 566.]

## VII.    CONCLUSION

Kaspar is rightfully before this Court because of his individual acts, and UW has exceeded its burden under the pleading standard as to all claims. Kaspar's motion to dismiss should be denied.

Respectfully submitted,

*/s/ Justin M. Croniser*

Justin M. Croniser (0079462)
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Phone: (216) 621-0150
Fax: (216) 241-2824
jcroniser@hahnlaw.com

Adam C. Sims (0093474)
HAHN LOESER & PARKS LLP
65 E. State Street, Suite 1400
Columbus, Ohio 43215
Phone: (614) 453-7104
asims@hahnlaw.com

Joseph V. Saphia (New York Bar No. js3680;
admitted pro hac vice) – Trial Attorney
Jessica H. Zafonte (New York Bar No. jz7813;
admitted pro hac vice)
CHIESA, SHAHINIAN & GIANTOMASI P.C.
11 Times Square, 34th Floor
New York, New York
Phone: (212) 324-7229
jsaphia@csglaw.com
jzafonte@csglaw.com

*Attorneys for Plaintiff Free State of Bavaria*
*represented by The University of Würzburg*

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing Response in Opposition to Defendant Brian Kaspar, M.D.'s Motion to Dismiss was filed via the court's e-filing system this 4th day of November 2022, which will serve all counsel of record.

*/s/ Justin M. Croniser*           
*One of the Attorneys for Plaintiff*
*The University of Würzburg*

14159999.1